IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| SARA KAHLER, *individually and as next friend for KK, a minor*, and TYLOR KAHLER,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | Case No. 23-cv-00300-DKW-WRP<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Defendant United States of America moves for summary judgment, arguing that all of Plaintiffs' claims are untimely because "it is clear" they accrued in September 2019, more than two years before submitting them to an administrative agency, as required by the Federal Tort Claims Act (FTCA). Dkt. No. 59. Having reviewed the summary judgment record and heard oral argument, it is far from clear, and certainly not clear as a matter of law, when Plaintiffs' claims of medical negligence accrued. As a result, because it is the government's burden to establish the statute-of-limitations defense upon which it relies, the Court DENIES the motion for summary judgment.

## PROCEDURAL BACKGROUND

Plaintiffs Tylor and Sara Kahler initiated this case with the filing of a Complaint on July 20, 2023 against the United States of America and Doe Defendants 1-100. Compl., Dkt. No. 1. Therein, Plaintiffs bring two counts of negligence -- the first for "medical negligence" and the second for "negligent failure to provide informed consent". *Id*. at 7, 12. They seek damages for injuries, including "permanent brain injury, strokes, and brachial plexus injury." *Id*. at ¶ 34.

On September 27, 2023, the United States moved to dismiss the Complaint on the same basis as the one raised in the instant motion for summary judgment: Plaintiffs' alleged failure to bring their claims within the two-year statute of limitations mandated in the FTCA. Dkt. No. 13. After briefing, on December 21, 2023, the Court denied the motion to dismiss. Dkt. No. 20. Among other things, the Court did so because, accepting the allegations of the Complaint as true, the government had failed to show that Plaintiffs' claims were untimely.

On May 8, 2025, the United States filed the instant motion for summary judgment. Dkt. No. 59. The government again argues that Plaintiffs' claims are untimely because, on September 1, 2019, Plaintiffs were aware both that KK was injured and that her injuries were caused by "doctors' maneuvering" during a

2

"shoulder dystocia" at birth. Dkt. No. 59-1 at 12-14. The United States also argues that Plaintiffs are not entitled to equitable tolling of the statute of limitations because they did not act diligently in pursuing their rights and an extraordinary circumstance did not prevent them from filing a timely claim. *Id*. at 17-19.

The Kahlers oppose the motion for summary judgment. Dkt. No. 84. They argue that the "relevant" cause of injury was the failure to deliver KK by "C-section"—something of which they were not aware until after June 2022. Dkt. No. 84 at 13-14, 17-19. The Kahlers further argue that they did not learn of KK's injuries for which they now seek to recover—such as, "cerebral palsy" and "autism"—until July 2021 at the earliest. *Id*. at 14-17. These facts, according to the Kahlers, mean that their March 2023 administrative claim was filed within the two years mandated by relevant law. Finally, the Kahlers argue that even if that were not true, they are entitled to equitable tolling of the statute of limitations due to the "lack of full disclosure" from their treating doctors. *Id*. at 22-24.

The United States has filed a reply in support of the motion for summary judgment. Dkt. No. 90. On August 1, 2025, the Court held oral argument relating to the above-described briefing, at which all parties were represented by counsel. Dkt. No. 95. This Order now follows.

//

//

# **RELEVANT FACTUAL BACKGROUND**[1]

On August 31, 2019, Sara was admitted to Tripler Army Medical Center (Tripler) for labor and delivery. DCSF at ¶ 1. Dr. Nicholas Pyskir "estimated" KK's fetal weight at that time as 3,600 grams. PCSF at ¶ 10. Dr. Pyskir made this estimation after "palpat[ing] Sara externally[] using Leopold method…." *Id*. at ¶ 8; RCSF at ¶ 8. Tripler did not employ ultrasound technology to verify or independently estimate KK's fetal weight. PCSF at ¶ 23.[2] Leading up to the birth of KK, Tripler providers did not discuss the possibility of a Caesarian section with Sara. Depo. of Sara Kahler at 25:16-23 (Sara Depo. 1), Dkt. No. 85-12.[3]

KK was born on September 1, 2019. DCSF at ¶ 2. KK's weight at delivery was 4,990 grams. Medical Records of Sara Kahler at 14, Dkt. No. 85-5.[4] KK was delivered vaginally. PCSF at ¶ 15. During this process, KK's head was delivered, but her shoulders could not clear Sara's pelvic bones, and she became stuck in Sara's birth canal. *Id*. at ¶ 16. In other words, the delivery of KK was

---

[1] The relevant facts are taken from Defendant's concise statement of facts (DCSF), Dkt. No. 60, Plaintiffs' concise statement of facts (PCSF), Dkt. No. 85, Defendant's concise statement of facts in reply (RCSF), Dkt. No. 91, and the exhibits filed in support of each.
[2] While the United States "partially disputes" this assertion, the government's response does not, in fact, do so. *See* RCSF at ¶ 23.
[3] Plaintiffs also assert that the risks of shoulder dystocia were not explained to Sara. PCSF at ¶ 14. However, that assertion is not supported by the cited testimony.
[4] In citing this exhibit and other clinical or medical notes in the record, the Court uses the page numbers in the top-right corner of the documents, *i.e.*, "Page 14 of 19".

complicated by a "shoulder dystocia", which lasted 90 seconds. DCSF at ¶¶ 3-4. During the 90 seconds, Dr. Sarah Ligon performed multiple "maneuvers" to relieve the dystocia, with Dr. Ryan Phillips "stepp[ing] in" to perform additional "maneuvers" that delivered KK. *Id.* at ¶¶ 5-6. Drs. Ligon and Phillips performed "as many as [8] to 12 different maneuvers" during this time. PCSF at ¶ 17; RCSF at ¶ 17. During the delivery, Tylor "saw the doctor turn KK's head to the side and then he let the head go and the head snapped back to facing down." DCSF at ¶ 7.

After the delivery, KK was brought to the Neonatal Intensive Care Unit (NICU) at Tripler to treat "respiratory distress" and "decreased movement of her right shoulder", the latter of which is described as "Erb's palsy[.]" *Id.* at ¶ 8; PCSF at ¶ 28. On September 7, 2019, KK was noted as having a "rhythmic jerking event" in her right leg lasting 30-60 seconds. DCSF at ¶ 9. On September 8, 2019, KK underwent a neurology consultation with Dr. Philip Eye, who confirmed that KK had suffered a seizure. *Id.* at ¶ 10; PCSF at ¶ 29. On September 9, 2019, an MRI revealed that KK had suffered a stroke. DCSF at ¶ 11; PCSF at ¶ 30.

Providers at Tripler told Sara that "the stroke was because of maneuvering out, of taking [KK] out at birth." DCSF at ¶ 12; Sara Depo. 1 at 128:19-23. Providers also told the Kahlers that they had to "break KK's shoulder to get her out

because she was too big." DCSF at ¶ 13. Providers further told the Kahlers they "cannot tell at this time" if KK would have future strokes or seizures. *Id*. at ¶¶ 20-21. Dr. Eye told the Kahlers that "[r]ecovery differs from every case, that there was some damage to KK's brain but that eventually since she's so young, the brain covers itself over and mends itself, that she would recover from it." Sara Depo. 1 at 42:7-17. Sara understood KK's stroke and seizure to have been caused by "Tripler providers moving KK's shoulder inward to narrow her body and causing breakage or dislocation near KK's neck." DCSF at ¶ 14. Sara also understood that, since KK was a "large baby", "there would be some stuff that could happen…[l]ike the shoulder dystocia and stroke because of the maneuvering." *Id*. at ¶ 15. Tylor understood that shoulder dystocia "was the reason why KK's hand was staying fisted[] and her right arm was not moving normally." *Id*. at ¶ 16. Dr. Eye told the Kahlers that he "could not give a confident answer" about whether KK would have another stroke. *Id*. at ¶ 19. Tylor understood that KK "could be perfectly fine but she could also not be[]", *id*., and she "may or may not have seizures" in the future. Depo. of Tylor Kahler at 52:22-53:3, Dkt. No. 85-15. According to Sara, the Kahlers were "under the impression" that KK would make a "full recovery" if she did physical, occupational, and speech therapies. Sara Depo. 1 at 130:18-131:5.

6

KK remained under treatment in the NICU before being discharged on September 14, 2019. DCSF at ¶ 17. KK's discharge plan included "following up with neurology, cardiology, physical therapy/occupational therapy, early intervention services, and speech therapy[.]" *Id*. at ¶ 18. The Kahlers were also given a "support group referral." *Id*. When KK was discharged from Tripler, she was "seizure free for two days and was not being given any seizure medication." PCSF at ¶ 36.

On October 1, 2019, Dr. Eye told the Kahlers that "KK could develop epilepsy in infancy or childhood" and Erb's palsy "varied in … every child[.]" Depo. of Sara Kahler at 49:17-50:7, Dkt. No. 60-1 (Sara Depo. 2).[5] During this visit, Dr. Eye noted that KK's Erb's palsy had "improved with good movement…." Medical Records of KK at 1, Dkt. No. 85-14. At some point, Dr. Eye "discussed" cerebral palsy with the Kahlers. DCSF at ¶ 34. On October 31, 2019, Cindy Sanekane, a physical therapist, informed Sara about "early intervention services for when they moved to Colorado[] based on KK's medical history and being at risk for developmental delays." DCSF at ¶ 23.

---

[5]The United States asserts that, during this October 1, 2019 meeting, Dr. Eye told the Kahlers that KK's Erb's palsy may worsen due to her stroke. DCSF at ¶ 22. However, the cited transcript does not support that assertion. Further, the cited medical records do not support the assertion that Dr. Eye *told* the Kahlers this information.

In the fall of 2019, the Kahlers moved to Colorado. *Id*. at ¶ 24. In May 2020, KK's primary care physician told the Kahlers that KK would need physical and occupational therapy and "would eventually need speech therapy depending on her condition." *Id*. At this same time, Sara told KK's primary care physician and neurologist that KK was not moving her right hand and not crawling, which concerned Sara. Sara Depo. 2 at 52:25-54:12.[6] While living in Colorado, Tylor "first noticed" that KK had a "drooling issue" to the extent that she would "drool when she focused on opening/using her right hand." DCSF at ¶ 26.

On May 26, 2020, KK visited Dr. Timothy Leubbert, a pediatric neurologist. 5/26/2020 Clinical Notes & Documents at 2-3, Dkt. No. 60-6. Sara told Dr. Leubbert that, during delivery, KK's "head was twisted in an unusual fashion, leading to a brachial plexus injury." *Id*. at 2. In paperwork for the visit, Sara reported that: (1) at 6 months of age, KK first "rolled over", "sat alone", and "laughed"; (2) at 7 months of age, KK first "said 'mama' or 'dada'"; and (3) at 8 months of age, KK first transferred a toy from one hand to the other and fed herself a cracker. *Id*. at 4. At the May 26, 2020 visit, Dr. Leubbert spent 35 minutes "counseling" the Kahlers, referred KK to "physical medicine and rehabilitation",

---

[6]The United States asserts that Sara told this information to a physical therapist and told three of KK's providers that she was "concerned" about KK not moving her hand and not crawling. DCSF at ¶ 25. The cited transcript does not support those assertions, however.

and advised the Kahlers to follow-up with neurology in 3-4 months. DCSF at ¶ 28. On October 21, 2020, Dr. Leubbert told Sara that KK's "ongoing difficulties with the right side of her body were becoming more apparent, emphasized the importance of therapy for KK, and recommended further rehab." *Id*. at ¶ 29. Dr. Leubbert advised them to return in a year. Medical Records of KK at 7, Dkt. No. 85-17. According to Sara, at an unspecified appointment, Dr. Leubbert also talked about "[e]verything seem[ing] stable for now." Sara Depo. 1 at 52:9-53:12.

During an unspecified time or period, Tylor did not feel that therapy was helping KK, which caused "tension" with Sara. DCSF at ¶ 30. In 2021, the Kahlers inquired about obtaining a service animal for KK because they "knew the seizures could or could not come back…." *Id*. at ¶ 31. In the same year, the Kahlers "knew [KK's] speech wasn't coming along because she would babble a lot … we wouldn't understand what she was trying to say at all. She was drooling a lot for an older age." *Id*. at ¶ 32. On July 28, 2021, Dr. Jordan Wyrwa, who appears to be a physician in "pediatric rehabilitation medicine", *see* 7/28/2021 Clinical Notes at 7 (Dkt. No. 60-8), and Sara "discussed cerebral palsy due to the stroke, dystocia, and birth trauma, and treatment, including PT/OT, leg length monitoring, and speech pathology[.]" DCSF at ¶ 33.[7] A "clinic note", dated July 28, 2021,

---

[7]Although Plaintiffs do not dispute these factual assertions, *see* PCSF at 1, the same are not supported by the government's cited exhibits.

9

stated that KK presented "with right spastic hemiparetic cerebral palsy…." Medical Records of KK at 1, Dkt. No. 85-17. On August 13, 2021, Dr. Wyrwa noted "cerebral palsy as chronic" and "prescribed KK braces." DCSF at ¶ 33. Through October 2022, KK continued neurological treatment, physical and occupational therapy, and "at-home exercises…." *Id*. at ¶ 35.

After October 2022, the Kahlers moved back to Hawaiʻi and continued KK's therapy and neurology treatment. *Id*. at ¶¶ 35, 37. On November 6, 2023, Sara filled out an "Initial Visit" form for a neurology visit, noting in the "Developmental History" that KK had delayed speech and walking and that seizures were a "chronic illness/condition" starting at birth on September 1, 2019. *Id*. at ¶ 38. Sara further noted that "complications during labor/delivery were stroke, seizures, and right shoulder dystocia." *Id*. at ¶ 39.

In October 2023, an "EEG" was performed on KK, showing the "presence of epileptiform discharges in the left frontotemporal region … during sleep[.]" Medical Records of KK at 3, Dkt. No. 85-16.[8] In July 2024, Dr. Betty Freeman identified behavior of KK that she believed to be "in all likelihood" on the autism "spectrum." Depo. of Dr. Betty Freeman at 27:19-28:21, Dkt. No. 85-18. In

---

[8]The Kahlers cite this exhibit to purportedly establish their "aware[ness]" of KK's seizure activity. PCSF at ¶ 43. The exhibit, however, does no such thing.

October 2024, KK suffered a seizure. Medical Records of KK at 19, Dkt. No. 85-16.[9]

According to the Kahlers, in March 2022, they "realized" KK had "delayed development" after observing and comparing her to their second child. Decl. of Sara Kahler at ¶¶ 3-4, Dkt. No. 85-2; Decl. of Tylor Kahler at ¶¶ 3-4, Dkt. No. 85-3. In June 2022, the Kahlers "became aware of a news story about malpractice at Tripler during a birth that resulted in injuries similar to those suffered by their child, and they wondered if their child suffered from negligence as well, so they contacted the attorneys that handled the prior case." PCSF at ¶ 54.

On March 8, 2023, the United States received FTCA claims from the Kahlers. PCSF at ¶ 1.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim in the case on

---

[9]The Kahlers cite this exhibit for the assertion that KK "did not have a seizure recurrence until October 2024." PCSF at ¶ 39. The information cited, however, cannot alone be stretched that far.

which the non-moving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In contrast, when the moving party bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted…."  *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).  This means that the movant "must establish beyond controversy every essential element" of its claim.  *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quotation omitted).  In assessing a motion for summary judgment, all facts are construed in the light most favorable to the non-moving party–here, the Kahlers.  *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

## DISCUSSION

The United States moves for summary judgment on a single ground: whether Plaintiffs submitted their claims within the FTCA's applicable two-year statute of limitations.  According to the United States, Plaintiffs did not because KK's injuries and Plaintiffs' awareness of the cause of the same were known in September 2019—more than two years before March 8, 2023, when their FTCA claims were submitted.  According to Plaintiffs, their claims were timely submitted because they were not aware of the injuries for which they seek to

recover in this case until July 2021 or the cause of the same until June 2022—both less than two years before March 2023.

To address this dispute, the Court begins with certain general principles. Initially, as at the motion-to-dismiss stage, the parties agree at least on the basic legal framework with which to view their dispute.  Specifically, both parties agree that a claim accrues—and the statute of limitations starts ticking—under the FTCA when a party "discovers, or in the exercise of reasonable diligence should have discovered, the injury and its cause."  Dkt. No. 59-1 at 9 (citing *Tunac v. United States*, 897 F.3d 1197 (9th Cir. 2018)); *see also* Dkt. No. 84 at 10-11 (citing *United States v. Kubrick*, 444 U.S. 111 (1979)).  As the parties' dispute suggests, however, this agreement only goes so far, leaving open certain additional matters discussed below.

First, there is the burden of proving whether the claims here are timely or not.  Although the United States appears to suggest that "the burden is on the plaintiff", Dkt. No. 59-1 at 10, the Court disagrees.  Rather, as the case to which the government cites concludes, "[a] defendant raising the statute of limitations as an affirmative defense has the burden of proving the action is time-barred.… Thus, the defendant has the burden of demonstrating the complained of wrongdoing *and* harm occurred outside the limitations period."  *Cal. Sansome Co.*

13

*v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995) (emphasis in original). This is true too in the context of the FTCA. *Gero v. U.S. Government*, 2017 WL 550230, at *5 & n.3 (N.D. Cal. Feb. 10, 2017) (citing cases and explaining that, in an FTCA action, a "defendant must show that it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim."); *see also U.S. v. Kwai Fun Wong*, 575 U.S. 402, 420 (2015) (holding that the FTCA's two-year statute of limitations is non-jurisdictional).

Second, further explanation of the relevant inquiry for determining discovery of "the injury and its cause" is warranted. With respect to injury, the Ninth Circuit Court of Appeals has explained that a "claim under the FTCA accrues only when the injury has *manifested* itself." *Rosales v. United States*, 824 F.2d 799, 804 (9th Cir. 1987) (emphasis added). Thus, "[p]atients may reasonably rely on assurances by physicians that complications are normal and do not indicate that an actual injury has occurred." *Id*. As for cause, the Ninth Circuit has explained that, in an FTCA action, "the cause is known when the immediate physical cause of the injury is discovered." *Gibson v. United States*, 781 F.2d 1334, 1344 (9th Cir. 1986) (quotations and brackets omitted); *Dyniewicz v. United States*, 742 F.2d 484, 486 (9th Cir. 1984) ("Discovery of the cause of one's injury, however, does not mean knowing who is responsible for it.").

14

With these general principles in mind, the Court turns to the dispute at hand, starting with the cause of KK's injuries. In light of the representations of Plaintiffs' counsel at the oral argument hearing and the undisputed factual record, resolution of this issue is reasonably straightforward. Notably, at the hearing, Plaintiffs' counsel acknowledged that the "immediate cause" of KK's injuries was the maneuverings or "manipulation" performed by the doctors at Tripler. Based upon the just-cited case law, along with the undisputed fact that Plaintiffs' were aware of the maneuverings in September 2019, this is sufficient to find as a matter of law that Plaintiffs had discovered, or reasonably should have discovered, the cause of KK's injuries more than two years before submitting their claims. *See Gibson*, 781 F.2d at 1344, DCSF at ¶¶ 5-7, 12-15; PCSF at 1, ¶ 17.

Plaintiffs attempt to avoid this result by citing out-of-Circuit case law for the propositions that, for a claim to accrue, they must be aware of "an act or omission attributable to the government" and this Court should look to "antecedent" causes for the same. Dkt. No. 84 at 13-14. Plaintiffs' arguments are misplaced. First, this Court is bound by Ninth Circuit case law. As recited above, the Ninth Circuit has directed courts to look to the *immediate* physical or medical cause of an injury as the relevant cause when assessing timeliness. *See Gibson*, 781 F.2d at 1344; *Dyniewicz*, 742 F.2d at 486. There is no dispute that the immediate cause here is

15

what took place during the delivery of KK on September 1, 2019.  The fact that courts in other Circuits have taken a different approach is irrelevant.  *See Arroyo v. United States*, 656 F.3d 663, 671 n.3 (7th Cir. 2011) (acknowledging that the Ninth Circuit has "endorsed" a different approach to the Seventh Circuit's—the same one Plaintiffs ask this Court to follow).  Second, even if the Ninth Circuit had not spoken on this subject in the manner it has, the cases Plaintiffs cite would not help them.  As just mentioned, Plaintiffs cite those cases for the proposition that they must be aware of "an act or omission attributable to the government".  Here, the maneuverings of which they were undisputedly aware *were* acts attributable to the government as acts of Tripler's medical providers.  *Arroyo* and *Lee v. United States*, 485 F. Supp. 883 (E.D.N.Y. 1980), do not require anything more.

This leaves when Plaintiffs discovered, or reasonably should have discovered, KK's injuries.  For the reasons discussed further below, on the present factual and briefing record, the Court is unable to reach any finding *as a matter of law* on this subject.

The United States argues that Plaintiffs knew KK was injured "the day she was born[,]" pointing to KK suffering a stroke, seizure, and right-sided mobility issues.  Dkt. No. 59-1 at 13-14.  While the Complaint could certainly be

16

construed as seeking damages for these particular injuries, *see* Compl. at ¶ 34, that is apparently no longer the case.  Instead, in their response and at oral argument, Plaintiffs state that the "injuries for which they seek to recover" are cerebral palsy, autism, and "other significant injuries", *id*. at 16-17, which at oral argument Plaintiffs' counsel clarified meant "speech problems, behavior problems, cognitive issues, learning problems, very subtle motor issues, and autistic behaviors."[10]  In reply, the United States argues that Plaintiffs' reliance on cerebral palsy and "developmental delays" is a "red herring" because KK's symptoms "presented years earlier[]" and Plaintiffs were aware KK had suffered brain damage at birth. Dkt. No. 90 at 8-10.

The Court disagrees that the summary-judgment record supports such assertions.  First, contrary to the government's contentions, the record is far from clear when KK's alleged injuries first manifested themselves.  According to the United States, "symptoms" "presented years earlier[,]" but, other than counsel's say-so and citations to the internet for purported "well-known medical facts", there is simply no *evidence* that *any* of the symptoms to which the government points, such as KK's "movement issues", "sitting alone", or "transferring toys between hands" (Dkt. No. 59-1 at 6, Dkt. No. 90 at 9), constitute symptoms or

---

[10]The Court notes that both parties also refer to these "other" alleged injuries as "developmental delays".  *See, e.g.*, Dkt. No. 59-1 at 6; Dkt. No. 84 at 17.  The Court similarly does so herein.

17

manifestations of any of the relevant injuries, such as cerebral palsy, for which Plaintiffs now seek recovery.

As for awareness or even the existence of alleged "brain damage", the record is equally lacking. Notably, the government's concise statement of facts mentions the word "brain" just once, and then only in the context of Tylor being told that brains are "malleable and could repair themselves sometimes[.]" DCSF at ¶ 19. There is simply no evidence either that KK suffered brain damage at or near birth,[11] or, if she did, that Plaintiffs were told as much or otherwise should have been aware of the same.[12] Indeed, the current record shows, at least with respect to the latter, the opposite. Specifically, the United States acknowledges that, when Plaintiffs left Tripler in September 2019, Plaintiffs understood that KK "could be perfectly fine but she could also not be" and even Tripler's doctors "cannot tell at this time" whether KK would have future seizures. DCSF at ¶¶ 19-21.[13]

---

[11]Such evidence would likely require the opinion of a medical professional. No such expert evidence appears in this record. Nor can the Court assume the same merely because KK suffered a stroke and/or a seizure at or near birth. *See Hagan v. United States*, 275 F. Supp. 3d 252, 262 (D.D.C. 2017) (denying summary judgment on the FTCA's statute of limitations because, *inter alia*, testimony regarding a child's alleged brain injury was "equivocal" and "[w]hether a stroke and seizures are themselves brain injuries are disputed factual issues.").
[12]This case is, thus, different from *T.L. v. United States*, 443 F.3d 956, 962-963 (8th Cir. 2006), upon which *Ortiz v. United States*, 2007 WL 404899 (E.D. Cal. Feb. 2, 2007)—a case cited by the government (Dkt. No. 59-1 at 12-13)—relies, because, in *T.L.*, the plaintiff-parent was informed her child had suffered a "severe, permanent" and "irreversible" brain injury.
[13]Further, Sara testified to being told by Dr. Eye that KK "would recover" from any brain damage.

Although the United States appears to believe that these facts support its case, *see* Dkt. No. 59-1 at 14, they show, at least in September 2019, that no one knew whether KK would suffer lasting injuries, such as those relating to her brain.

Finally, the Court observes that the foregoing discussion focuses in no small part on the alleged "symptoms" of one or more medical conditions. As an initial matter, neither party explains, whether from a legal or medical perspective, when it is that an injury relevant to Plaintiffs' claims manifests itself. Similarly, neither party connects any particular symptom or symptoms to any pertinent injury. In other words, there is no evidence that any particular symptom is, in fact, a symptom of any particular malady or, in conjunction with other symptoms, characteristic of any particular medical condition.[14] These, along with many more, questions are unanswered on the current record.[15] Because the Court is

---

[14] For example, is "rolling over" or "saying mama or dada" a symptom of an unidentified "developmental delay[]", as the government appears to suggest? DCSF at ¶ 27. Is excessive drooling characteristic of autism or cerebral palsy? For what alleged injury were the "ongoing difficulties with the right side of [KK's] body" a symptom? *Id*. at ¶ 29.

[15] At oral argument, the United States asserted that "anything" to do with KK's "right-sided movement issues" was a symptom of cerebral palsy. However, there is not a single piece of evidence in the record supporting such an assertion, which, again, would likely need to come from a medical professional. The United States also relies upon the fact that Dr. Eye and Plaintiffs "discussed" "cerebral palsy" before the end of 2019. Dkt. No. 90 at 9. Other than the mere fact of a discussion occurring, however, the government provides not a single piece of information on *what* was discussed. Thus, as the Court observed at oral argument, the "discussion" could have consisted of Dr. Eye advising Plaintiffs that KK would *never* suffer from cerebral palsy, which would hardly provide support for the government's statute of limitations defense.

unable to draw a meaningful connection between any alleged symptom and any alleged injury, it is unable to find as a matter of law when any such injury manifested itself at this time.

## CONCLUSION

For the reasons set forth herein, the motion for summary judgment, Dkt. No. 59, is DENIED.[16]

IT IS SO ORDERED.

Dated: August 20, 2025 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

---

Sara Kahler, et al vs. United States of America, et al; Civil No. 23-00300 DKW-WRP; **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

[16]Because it is unnecessary, the Court does not address herein whether equitable tolling would apply to any otherwise untimely claims.