IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SARA KAHLER, *individually and as next friend for KK, a minor*, and TYLOR KAHLER,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>    Defendants. | Case No. 23-cv-00300-DKW-WRP<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

On January 26, 2026, the Court began a seven-day non-jury trial in this medical malpractice action between Plaintiffs Tylor and Sara Kahler, with the latter proceeding individually and as next friend for K.K., a minor, and Defendant United States of America.   With the conclusion of trial on February 3, 2026, the submission of the parties' proposed findings of fact and conclusions of law on March 6, 2026, and consideration of the evidence admitted at trial and applicable law, the Court now makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

## **FINDINGS OF FACT**[1]

1.  Plaintiffs Sara Kahler (Sara) and Tylor Kahler (Tylor, and, with Sara, the Kahlers) are the parents of Plaintiff K.K., a minor (collectively, Plaintiffs). Plaintiffs' Proposed Findings of Fact (PPFOF) at ¶ 11, Dkt. No. 195; Defendant's Proposed Findings of Fact (DPFOF) at ¶ 4, Dkt. No. 194.

2.  K.K. was born on September 1, 2019.   January 28, 2026 Trial Transcript (1/28/26 Tr.) at 88:12-13, Dkt. No. 189.

3.  At the time of K.K.'s birth, Tylor was an active duty military service member stationed in Honolulu, Hawai'i.   PPFOF at ¶ 13.

4.  As a result, Sara received pre-natal care related to K.K. at Tripler Army Medical Center (Tripler) in Honolulu.   1/28/26 Tr. at 88:16-22.

5.  Defendant United States of America operates Tripler, a medical facility, through its agents and/or employees.   Complaint at ¶ 8, Dkt. No. 1.

6.  Sara began pre-natal care at Tripler in January 2019.   DPFOF at ¶ 5.

7.  Prior to her pregnancy, Sara weighed 170 pounds and measured 5 feet 4 inches in height.   DPFOF at ¶ 6.

8.  In terms of body mass index (BMI), this meant Sara was obese at the time of her pregnancy.   PPFOF at ¶ 22(c).

---

[1]Any finding of fact deemed a conclusion of law is incorporated into the Conclusions of Law. Any conclusion of law deemed a finding of fact is incorporated into the Findings of Fact.

9. A January 2019 treatment note for Sara observed "[o]besity complicating pregnancy". Joint Exhibit 2 (J-2) at USA_000700.

10. At the same time, Sara's "risk level" was observed as "[u]ncomplicated". J-2 at USA_000695.

11. This pattern of "[o]besity complicating pregnancy" and an "[u]ncomplicated" "risk level" repeated itself in Sara's treatment records prior to the birth of K.K. PPFOF at ¶ 22(d); DPFOF at ¶ 10.

12. On August 29, 2019, the date of Sara's final pre-natal visit to Tripler prior to going into labor, she weighed 234 pounds. PPFOF at ¶ 23(c); DPFOF at ¶ 11.

13. In terms of BMI, this is considered "morbidly obese." PPFOF at ¶ 22(f); DPFOF at ¶ 11.

14. In addition, this represented a weight gain of 64 pounds during Sara's pregnancy, an amount which is considered "excessive". PPFOF at ¶ 23(a).

15. Obesity and excessive weight gain during pregnancy increase the risk of having a macrosomic baby. PPFOF at ¶ 24; DPFOF at ¶ 12.

16. A "macrosomic" baby is one weighing at least 4,500 grams for a mother with gestational diabetes or at least 5,000 grams for a mother without gestational diabetes. January 27, 2026 Trial Transcript (1/27/26 Tr.) at 78:9-16, Dkt. No. 188.

3

17. Sara was not diagnosed as having gestational diabetes.   1/27/26 Tr. at 77:25-78:4.

18. Neither obesity nor excessive weight gain are reasons for treating a patient's pregnancy as "high risk".   February 2, 2026 Trial Transcript (2/2/26 Tr.) at 11:14-16, Dkt. No. 192; January 29, 2026 Trial Transcript (1/29/26 Tr.) at 39:23-25, Dkt. No. 190.

19. The estimation of fetal weight is a "critical" assessment in managing a patient's labor.   2/2/26 Tr. at 32:20-22.

20. For a non-diabetic mother, like Sara, an estimated fetal weight of 5,000 grams or more results in a discussion with the mother about having a caesarean delivery, which is clinically recommended.   1/29/26 Tr. at 47:18-22, 62:1-3.

21. There are two methods to estimate the weight of a fetus, which is known as the estimated fetal weight or EFW.   PPFOF at ¶¶ 21, 26.

22. The two methods, in no particular order, are a "Leopold" examination and ultrasound.   PPFOF ¶ 26.

23. A "Leopold" examination involves determining the EFW by touch -- "first of all by putting your hands on the top of the abdomen…and the bottom to feel the length of the fetus", "then typically you put the hands on the side to try to get a sense of the girth of the fetus and then you typically would walk the fetus…to get a

sense of…momentum of the fetus." January 26, 2026 Trial Transcript (1/26/26 Tr.) at 29:24-30:8, Dkt. No. 187.

24. To obtain the EFW by ultrasound, four measurements of the fetus are required: the head circumference, the biparietal diameter of the head, the abdominal circumference, and the length of the femur. PPFOF at ¶ 31; DPFOF at ¶ 54.

25. An ultrasound was performed on Sara in April 2019, with an EFW for K.K. of 372 grams. J-2 at USA_000683-684.

26. On May 15, 2019, at roughly 25 weeks of gestation, Sara underwent another ultrasound, with an EFW for K.K. of 780 grams. J-2 at USA_000675-676.

27. No further estimates of K.K.'s fetal weight, whether by ultrasound or Leopold, were performed prior to Sara's admission to Tripler on August 31, 2019 for labor and delivery. PPFOF at ¶ 37; 2/2/26 Tr. at 12:7-11.

28. That is because there was no clinical "indication" to estimate fetal weight after 24 weeks of gestation and/or during Sara's third trimester. 1/29/26 Tr. at 23:21-24, 41:4-12; 2/2/26 Tr. at 11:5-8, 11:17-19, 12:12-15.

29. Neither a Leopold examination nor an ultrasound offers a precise EFW. 1/26/26 Tr. at 82:25-83:4-7; 2/2/26 Tr. at 18:6-8, 60:24-25.

30. And, unless there is a clinical indication for one method over the other, neither Leopold nor ultrasound is better at estimating fetal weight. 2/2/26 Tr. at 19:9-11.

31. In a "Practice Bulletin" titled "Fetal Macrosomia", the American College of Obstetricians and Gynecologists (ACOG) stated that no study has proven ultrasonography to be superior to Leopold examination in a clinically meaningful way. 1/26/26 Tr. at 83:9-18; 1/27/26 Tr. at 107:22-108:8.

32. ACOG has also stated that a mother who has had a child in the past is as good at estimating fetal weight as a clinician performing a Leopold examination or an ultrasound. 2/2/26 Tr. at 60:17-24.

33. ACOG provides "guidelines" to obstetricians and gynecologists. 1/26/26 Tr. at 77:23-78:4; 1/27/26 Tr. at 96:21-23; 2/2/26 Tr. at 9:13-16.

34. On August 31, 2019, after her water broke, Sara presented to Tripler's labor and delivery triage at approximately 9:16 a.m.. PPFOF at ¶ 40; DPFOF at ¶ 20.

35. At roughly 10:02 a.m., a "History and Physical" examination of Sara was performed by Dr. Nicholas Pyskir. J-2 at USA_000897-902.

36. At this time, the "Supervising Resident" at Tripler was Dr. Sarah Ligon and the "Supervising Staff/Attending" was Dr. Brian Pierce. J-2 at USA_000902.

6

37. On August 31, 2019, Dr. Pyskir was a first-year resident, with about one week of obstetrics experience specific to Tripler.    1/29/26 Tr. at 60:3-10.

38. Dr. Pyskir's obstetrics experience, though, began before Tripler.    1/29/26 Tr. at 83:6-7.

39. Specifically, Dr. Pyskir's first obstetrics experience was in Medical School at the University of Texas.    1/29/26 Tr. at 83:6-7.

40. Apart from "formal curriculum", this included clinical obstetrics experience in San Antonio, which routinely saw him taking care of patients in excess of 300 to 400 pounds for labor and delivery.    1/29/26 Tr. at 83:6-16.

41. Dr. Pyskir gained additional experience during subinternship rotations at San Antonio Medical Center and Walter Reed National Military Medical Center. 1/29/26 Tr. at 83:17-22.

42. During this time, Dr. Pyskir's wife was in her third trimester of pregnancy, which allowed Dr. Pyskir to frequently ultrasound and palpate his wife.    1/29/26 Tr. at 83:22-84:2.

43. In San Antonio, Dr. Pyskir performed "dozens" of Leopold examinations, not including his wife.    1/29/26 Tr. at 88:8-10.

44. At Tripler, Dr. Pyskir received additional training on Leopold examinations. 1/29/26 Tr. at 88:17-19.

45. Before meeting Sara, Dr. Pyskir had performed approximately 20 Leopold examinations at Tripler.   1/29/26 Tr. at 89:14-18.

46. During Sara's "History and Physical" on August 31, 2019, Dr. Pyskir estimated K.K.'s fetal weight as 3,600 grams.   J-2 at USA_000901.[2]

47. This estimate was reached using a Leopold examination.   J-2 at USA_000901; 1/29/26 Tr. at 62:10-15.

48. While an ultrasound was also performed on Sara at Tripler on August 31, 2019, it was used to determine the position of K.K.—not to estimate fetal weight. J-2 at USA_000901.

49. As part of his labor and delivery intake on August 31, 2019, Dr. Pyskir also counseled Sara on an "Informed Consent for Performance of Procedure and Request for Anesthesia".   J-2 at USA_000569-575.

50. Such an informed consent covers the typical route for a vaginal delivery, alternative methods of delivery that may become necessary, including caesarean delivery, other emergency procedures that might be necessary, including blood transfusion, and shoulder dystocia.   1/29/26 Tr. at 77:9-25.

---

[2]The parties dispute whether Dr. Pyskir was the only medical practitioner to estimate K.K.'s fetal weight on August 31, 2019 and/or whether Dr. Pyskir did so under supervision of a more senior resident, such as Dr. Ligon.   *Compare, e.g.*, PPFOF at ¶ 56, *with* DPFOF at ¶ 43.   For purposes herein, the Court *assumes* that Dr. Pyskir was the only medical practitioner who estimated K.K.'s fetal weight on August 31, 2019 and that he did so without supervision.   Because it is unnecessary, the Court does not resolve these disputes.

51. "Shoulder dystocia" occurs when a baby's shoulder becomes stuck behind the pubic bone, most commonly during a vaginal delivery.   1/29/26 Tr. at 78:16-20.

52. After Dr. Pyskir reviewed informed consent with Sara, she signed the informed consent form without asking any questions.   1/28/26 Tr. at 102:25-103:11; J-2 at USA_000575.

53. Sara's "active labor" began at 6:00 p.m. on August 31, 2019.   J-2 at USA_000877.

54. The first phase of Sara's active labor, which includes the start of labor until full dilation, was "uneventful" and normal in terms of duration and fetal health. 1/26/26 Tr. at 46:14-21.

55. Sara reached full dilation at 12:30 a.m. on September 1, 2019.   J-2 at USA_000877.

56. The second phase—also known as the "expulsive phase"—was "complicated" by a shoulder dystocia.   1/26/26 Tr. at 46:14-24.

57. More specifically, as K.K's head delivered, it became evident that K.K.'s anterior shoulder, which is considered the "upper" shoulder, was caught behind Sara's symphysis pubis, which is a bone at the front of the pelvis.   1/26/26 Tr. at 26:23-27:4, 50:24-51:2.

58. Dr. Ligon "managed" Sara through labor.   January 30, 2026 Trial Transcript (1/30/26 Tr.) at 45:19-20, Dkt. No. 191.

59. In Sara's medical records, J-2 at USA_000877, Dr. Ligon described the initial part of K.K.'s delivery as follows:

> I entered the room after one hour of laboring down from c/c/0. Her Foley catheter was removed. With good maternal effort and reassuring fetal status, the patient pushed slowly [to] deliver the fetal head in the OA [Occiput Anterior] position. Additional help was called for and the bed was lowered. Initial attempt at gentle downward traction was not successful in delivering the right anterior shoulder. McRoberts was attempted, again without success. Time was marked, pediatrics called, and an OB [obstetrics] alert was sounded. Episiotomy was considered, but no soft tissue dystocia noted. Suprapubic pressure was applied without movement of the anterior shoulder. I attempted to deliver the posterior arm, but again no movement was noted. I attempted Woodscrew and Rubins maneuvers without success. Gentle downward traction, McRoberts, suprapubic pressure, and delivery of the posterior arm were again attempted without success. I then asked for help and Dr. [Ryan] Phillips stepped in.

60. In Sara's medical records, J-2 at USA_000878, Dr. Ryan Phillips, at the time, the chief obstetrics resident at Tripler, described the remaining part of K.K.'s delivery as follows:

> After Dr. Ligon attempted several maneuvers as noted above I stepped in and took over attempting to resolve the dystocia. I attempted to deliver the posterior arm, but again no movement was noted. I attempted Rubins maneuvers without success and noted that fetus had no rotational movement at all during attempt indicating to me that attempts at further rotational maneuvers wou[ld] fail. I attempted the posterior arm again noting this time the arm was fully extended and that there was no room to sweep it in front of the

10

neonate. At this time [I] placed several fingers underneath the armpit of the posterior arm and gave gentle traction. I noted some movement, but noted it seemed initially that the perineal tissue was holding the shoulder in. I considered episiotomy, however noted that I could easily displace tissue downward. With next set of pushes I again provided traction under the armpit while simultaneously using my other hand to push the perineal tissue downward and out of the way. The posterior shoulder then delivered. The head restitu[t]ed to ROA [Right Occiput Anterior] and with gentle downward traction along with maternal effort delivered the right anterior arm along with corpus.

61. K.K.'s birth weight was 4,990 grams or 11 pounds.   J-2 at USA_000879.

62. "Time" was called at 2:25 a.m.   J-2 at USA_000880.

63. K.K.'s head was delivered at 2:26 a.m.   J-2 at USA_000878.

64. K.K.s body was delivered at 2:27 a.m.   J-2 at USA_000879.

65. The entire shoulder dystocia event lasted 90 seconds.   J-2 at USA_000877, 879.

66. Generally speaking, shoulder dystocia can be safely relieved within 90 seconds.   1/26/26 Tr. at 98:4-7.

67. ACOG states that relieving shoulder dystocia within four minutes minimizes risk to the fetus.   1/26/26 Tr. at 97:23-25.

68. "Gentle downward traction" is something used in every delivery and involves the use of a doctor's hand or hands on a baby's head.   1/30/26 Tr. at 87:1-5.

69. A "McRobert's" maneuver involves extending and hyperflexing the mother's legs so that her knees are up to the chest and then applying gentle downward traction with the same amount of traction as any other delivery. 1/30/26 Tr. at 46:15-19.

70. "Suprapubic pressure" is performed at the same time as the McRobert's maneuver and involves applying pressure above the symphysis pubis to try and dislodge a baby's shoulder.   1/30/26 Tr. at 23:10-15, 51:6-10.

71. "Delivery of the posterior arm" involves a doctor putting her hand underneath the baby's posterior, or lower, arm and trying to bend the arm at the elbow, with the goal being to "sweep it across to get the anterior shoulder to release[.]"   1/26/26 Tr. at 52:24-53:1; 1/30/26 Tr. at 23:19-24:5.

72. "Woodscrew" and "Rubins" maneuvers involve a doctor putting two of her fingers on, respectively, the baby's anterior or posterior shoulder to change the diameter or angle between the shoulders.   1/30/26 Tr. at 28:20-25, 29:5-6, 29:14-20, 47:15-20.

73. The above-described maneuvers, including the final maneuver that relieved Sara's shoulder dystocia, each take about five seconds or less.   1/30/26 Tr. at 87:9-11, 91:3-7.

12

74. The final maneuver did not involve the use of rotational traction.   1/30/26 Tr. at 91:8-10.

75. "Rotational traction" means using rotational force to turn either one of a baby's shoulders left or right.   1/30/26 Tr. at 91:17-92:1.

76. During her performance of the above-described maneuvers, Dr. Ligon did not apply pressure to K.K.'s neck, and her hands did not apply pressure to K.K.'s head.   1/30/26 Tr. at 50:1-6.

77. The same is true of Dr. Phillips' performance of the maneuvers.   1/30/26 Tr. at 88:2-8.

78. Dr. Phillips does not recall whether she "touched" K.K.'s neck.   1/30/26 Tr. at 80:6-7.

79. Both Drs. Ligon and Phillips performed the above-described maneuvers correctly and/or within the standard of care.   1/26/26 Tr. at 61:18-20; 2/2/26 Tr. at 9:9-10.

80. Sara's introitus tissue did not compress K.K.'s neck during the shoulder dystocia.   1/30/26 Tr. at 50:7-11.

81. "Introitus tissue" is very soft tissue between the mother's perineum and hymen.   1/30/26 Tr. at 87:20-25.

13

82. Cord compression or impingement is a potential risk with shoulder dystocia. 2/2/26 Tr. at 106:20-23.

83. However, K.K.'s umbilical cord was noted as normal in Sara's medical records.   J-2 at USA_000879; 1/30/26 Tr. at 89:1-3.

84. The umbilical cord was also not wrapped around K.K.'s neck or any part of the body following delivery.   J-2 at USA_000879; 1/30/26 Tr. at 88:20-89:17.

85. Neither Dr. Ligon nor Dr. Phillips noticed compression of the umbilical cord.   1/30/26 Tr. at 51:25-52:2, 88:9-11.

86. During delivery, Dr. Phillips' "hand was in quite far[]" such that she could feel K.K.'s chest and abdominal areas, as well as K.K's shoulder blade, but Dr. Phillips did not feel the presence of the umbilical cord.   1/30/26 Tr. at 88:11-16.

87. Dr. Phillips did not "feel all around where a cord could be impinged[,]" though.   1/30/26 Tr. at 94:22-24.

88. Blood was taken from the umbilical cord after K.K.'s birth.   1/26/26 Tr. at 28:18-22.

89. The values from this blood sample were "low normal[,] but nowhere near the level that you would expect to see to cause damage to the fetus."   1/26/26 Tr. at 28:22-24.

14

90. Fetal heart tracing of K.K. also did not indicate compression of the umbilical cord.   2/2/26 Tr. at 28:23-29:3.

91. The placenta was delivered at 2:30 a.m.   J-2 at USA_000879.

92. The placenta appeared normal and intact and was not sent to pathology for study.   J-2 at USA_000879.

93. On September 1, 2019, after birth, K.K. was transferred to Tripler's neonatal intensive care unit (NICU) due to "shoulder dystocia with subsequent right shoulder palsy and respiratory distress."   Joint Exhibit 1 (J-1) at USA_000425.

94. In a "physical assessment" note associated with K.K.'s admission to the NICU, a nurse observed "[b]ruising; left" on K.K.'s face.   J-1 at USA_000429.

95. On September 7, 2019, while still in the NICU, K.K. was observed having "a rhythmic jerking event lasting 30-60 sec[onds]".   J-1 at USA_000471-472, 474.

96. As a result, an EEG (or electroencephalogram) and MRI were ordered.   J-1 at USA_000478.

97. The EEG indicated that K.K. was having seizures arising from the left side of her brain.   1/27/26 Tr. at 17:15-17.

98. K.K. had both clinical and subclinical seizures.   1/27/26 Tr. at 18:12-13.

99. Clinical seizures are ones that are visible to an observer, such as movements or abnormal behaviors.   2/2/26 Tr. at 98:10-13.

15

100. Subclinical seizures are ones that cannot be seen on the patient, but can be seen on an EEG.   1/27/26 Tr. at 19:2-3.

101. On September 9, 2019, an MRI was performed on K.K.'s brain.   J-1 at USA_000481.

102. This MRI showed K.K. had suffered an ischemic stroke (or infarct) in the left, middle cerebral artery.   J-1 at USA_000481; 1/27/26 Tr. at 20:1-2; 2/2/26 Tr. at 98:1-4.

103. An arterial ischemic stroke occurs when an artery occludes (or becomes obstructed) resulting in, first, reduced or absent blood flow and, then, damage to or sometimes death of tissue.   2/2/26 Tr. at 92:11-15.

104. There are a number of possible causes for a perinatal or neonatal arterial ischemic stroke.   2/2/26 Tr. at 72:7-13, 92:17-19.

105. Three of the possible causes are compression of the head and intracranial vessels, compression of the left carotid artery, and dissection (or a tear) of the carotid artery.   1/27/26 Tr. at 30:17-22, 63:21-64:2; 2/2/26 Tr. at 79:13-22; J-1 at USA_000485.

106. From the third cervical level, which is the "upper mid neck", and higher, there was no evidence of a dissection of K.K.'s carotid artery.   2/2/26 Tr. at 71:13-16.

16

107. Most dissections occur in these higher segments of the neck, especially when they are related to "manipulation." 2/2/26 Tr. at 71:22-24.

108. A tear of a neonatal artery could happen if there was "significant, abrupt rotational force". 2/2/26 Tr. at 118:11-14.

109. For compression of the carotid artery to cause a stroke, there would need to be pronounced, significant force for at least five minutes. 2/2/26 Tr. at 95:23:96:3.

110. Compression of the carotid artery for ninety seconds would not cause a stroke. 2/3/26 Tr. at 18:15-19:2.

111. This is due to an arterial structure known as the Circle of Willis. 2/2/26 Tr. at 86:2-8.

112. The Circle of Willis is a loop of arteries at the base of the brain that acts "like a traffic circle", allowing for communication of blood flow should it be needed more on one side than the other. 2/2/26 Tr. at 69:12-22; 1/26/26 Tr. at 158:20-22.

113. More specifically, if the artery on the left (or right) side of the circle was to be blocked, the artery on the right (or left) side would feed the other, blocked side. 2/2/26 Tr. at 69:17-19.

114. As a result, "compressing an artery would not interrupt blood flow sufficient to cause a stroke, an infarct."   2/2/26 Tr. at 70:20-21.

115. The cause of arterial ischemic stroke "in the vast majority of cases of babies" is a clot "usually" forming in the placenta, and travelling through the patent foramen ovale (PFO), which is a small opening between the right and left atrium of the heart, up to the middle cerebral artery.   2/2/26 Tr. at 93:14-25.

116. The "most likely" place that a clot would "lodge[]" or block the flow of blood is where the carotid artery bifurcates into the middle and anterior cerebral arteries.   2/2/26 Tr. at 67:17-21, 68:11-16, 70:22-71:5.

117. In a fetus, the PFO is always open because the fetus receives all blood and oxygenation from the placenta rather than the lungs.   2/2/26 Tr. at 94:2-8.

118. In addition, in a fetus, the pressure on the right side of the heart is higher than on the left side.   2/2/26 Tr. at 74:19-21.

119. This means that blood flows from the right atrium to the left atrium through the PFO.   2/2/26 Tr. at 94:6-8.

120. Normally, within the "first few minutes" of birth, a baby starts breathing, resulting in the pressure on the right side of the heart diminishing and the pressure on the left side increasing.   2/2/26 Tr. at 74:22-25.

18

121. At that point, *i.e.*, after the first few minutes of birth, it would be "paradoxical" for a clot to travel from the right to the left side of the heart.   2/2/26 Tr. at 74:25-75:2.

122. Shortly after birth, a baby's PFO generally closes.   2/3/26 Tr. at 12:10-11.

123. However, in 20-25 percent of babies, the PFO can stay open.   2/3/26 Tr. at 12:11-12.

124. Here, on September 10, 2019, an echocardiogram was performed on K.K., which showed she still had an open PFO "with L-R [left to right] shunting."   J-1 at USA_000487; 2/2/26 Tr. at 104:3-4.

125. During labor, there would be no way of knowing if any "small", *i.e.*, "microscopic", abnormality was present in the placenta.   2/2/26 Tr. at 102:20-103:2.

126. Based upon the September 9, 2019 MRI of K.K.'s brain, she may have suffered an ischemic injury 7-10 days before the MRI, 1/26/26 Tr. at 138:20-139:8, 5-14 days before the MRI, 1/27/26 Tr. at 28:25-29:2, or 7-14 days before the MRI, 2/2/26 Tr. at 76:6-10, 19-20, time periods that include before, during, and after K.K.'s delivery.

127. Dr. Frank Manning has over 40 years' experience in maternal fetal medicine (MFM) and has been part of thousands of baby deliveries.   1/26/26 Tr. at 77:7-12.

19

128. In Dr. Manning's entire career, he has never known shoulder dystocia maneuvers to cause a baby's stroke.    1/26/26 Tr. at 77:13-15.

129. Dr. Candida Brown has nearly 35 years' experience in pediatric neurology, and she too has never seen a baby who had a stroke caused by maneuvers to relieve shoulder dystocia.    1/27/26 Tr. at 64:14-23.

130. Dr. Orlando Snead has nearly 50 years' experience in pediatric neurology, and he has never seen a stroke caused by carotid artery compression or maneuvers used to relieve shoulder dystocia.    1/28/26 Tr. at 85:22-86:6.

131. Dr. Mary Kay Dyes has over 30 years' experience in pediatric neurology, and she has never seen a baby have a stroke as a result of maneuvers used to relieve shoulder dystocia.    2/2/26 Tr. at 103:7-14.

132. Dr. William Rhine has 36 years' experience as a neonatologist, seeing close to a thousand children with shoulder dystocia, and he has never seen a perinatal or neonatal arterial ischemic stroke caused by dystocia maneuvers.    2/3/26 Tr. at 19:7-14.[3]

---

[3]This brings to an end the Court's Findings of Fact.    So the record is clear, to the extent one or more of the parties' proposed findings of fact are not incorporated, in whole or in part, above, this is not due to oversight or failure to consider the same.    *All* of the parties' proposed findings of fact were considered prior to making the Findings of Fact herein.

20

## CONCLUSIONS OF LAW

133. The Court has jurisdiction over this case pursuant to Section 1346(b)(1) of Title 28 of the United States Code because this is a money-damages action against the United States for injuries allegedly caused by the negligent or wrongful act(s) or omission(s) of employees of the United States while acting in the scope of their employment.

134. Venue is proper in this District pursuant to Section 1391(b)(2) of Title 28 of the United States Code because a substantial part of the events occurred in the State of Hawaiʻi.

135. In the Complaint, Plaintiffs assert two causes of action: (1) medical negligence; and (2) negligent failure to provide informed consent.[4]  Compl. at ¶¶ 13-32.

136. Pursuant to Sections 1346(b)(1) and 2674 of Title 28 of the United States Code, in an action such as this, the United States may be liable in the same manner and to the same extent as a private individual under like circumstances, in

---

[4]In its proposed findings of fact and conclusions of law, the government contends that *three* causes of action have been brought: the ones mentioned above, along with a claim for loss of consortium.  DPFOF at ¶ 2.  This is not how the claims are presented in the Complaint, however, which clearly asserts only two causes of action, while once-mentioning, in relation to damages, consortium.  Compl. at ¶¶ 13-41.  The Court thus discusses only the two claims presented in the Complaint.  To the degree that consortium needed to be addressed, it would have been appropriate to do so in the damages phase of trial, which the parties stipulated to reserve to a later time, if needed.

accordance with the law of the place where the act or omission occurred; here, Hawaiʻi.

137. In Hawaiʻi, a claim of medical negligence has the following elements: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) a causal relationship between the breach and the injury suffered. *Estate of Frey v. Mastroianni*, 463 P.3d 1197, 1214 (Haw. 2020).[5]

138. Plaintiffs have the burden of establishing each of these elements by a preponderance of the evidence. *Estate of Frey*, 463 P.3d at 1207, 1214.

139. Except in certain situations not applicable here, in medical negligence cases, the question of negligence—including duty and breach—must be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving through expert testimony. *Craft v. Peebles*, 893 P.2d 138, 149 (Haw. 1995).

140. Under Hawaiʻi's "causal relationship" test, the defendant's conduct must be a "substantial factor" in bringing about the complained-of harm to the plaintiff. *Estate of Frey*, 463 P.3d at 1207.

---

[5]The Court notes that, in their proposed conclusions of law, Plaintiffs omit any mention of their claims—for example, the word "negligence" (or any derivation) never appears—let alone the legal standards related to the same.

141. This does not require the defendant's conduct to have been the whole cause or the only factor in the plaintiff's harm, but it must be one that a reasonable person would consider to have contributed to the harm. *Estate of Frey*, 463 P.3d at 1207.

142. When applied in the context of the burden of proof, a plaintiff must show that "the negligence of the defendant was more likely than not a substantial factor in bringing about the result complained of." *Estate of Frey*, 463 P.3d at 1207 (emphasis omitted).

143. In addition, establishing this causal relationship requires the introduction of expert medical testimony based upon a reasonable medical probability. *Estate of Frey*, 463 P.3d at 1214.

144. In Hawai'i, a claim of negligent failure to provide informed consent has the following elements: (1) the physician owed a duty to disclose the risk of one or more of the collateral injuries that the patient suffered; (2) the physician breached that duty; (3) the patient suffered injury; (4) the physician's breach of duty was a cause of the patient's injury in that (a) the physician's treatment was a substantial factor in bringing about the patient's injury and (b) a reasonable person in the plaintiff patient's position would not have consented to the treatment that led to the injuries had the plaintiff been properly informed; and (5) no other cause is a

superseding cause of the patient's injury. *Barcai v. Betwee*, 50 P.3d 946, 959-960 (Haw. 2002).

145. It is the plaintiff's burden to establish each of these elements. *Barcai*, 50 P.3d at 959.

146. In determining whether a physician owes a duty to disclose information to a patient, Hawai'i has adopted the "patient oriented standard." *Barcai*, 50 P.3d at 960.

147. This means that a physician must disclose "what a reasonable patient needs to hear from his or her physician in order to make an informed and intelligent decision regarding treatment[.]" *Barcai*, 50 P.3d at 960.

148. Ordinarily, expert testimony is required to establish the materiality of a risk or risks to a patient. *Barcai*, 50 P.3d at 960.

149. Turning now to the above-described claims, the Court first begins with Plaintiffs' claim of medical negligence and the elements of duty and breach.

150. The Court concludes that Plaintiffs have failed to establish, by a preponderance of the evidence, the breach of a duty in this case.

151. Initially, the Court agrees that estimation of fetal weight is a "critical" assessment in managing labor.

152. However, the Court disagrees with Plaintiffs' construction of the applicable duty or standard of care related to estimation of fetal weight.   Plaintiffs contend that the standard of care required Sara's EFW to be obtained by ultrasound, something which Tripler did not do once Sara presented for delivery on August 31, 2019.   Plaintiffs' Proposed Conclusions of Law at ¶¶ 134, 137, Dkt. No. 195. The Court disagrees, however, that this constitutes the applicable standard of care. Instead, at best, the Court concludes that the standard of care is, in a patient such as Sara having no clinical indication for an ultrasound, to perform the EFW by *either* Leopold or ultrasound prior to delivery.   This occurred here when the EFW was performed by Dr. Pyskir via Leopold examination.

153. The Court further disagrees that the standard of care required a doctor with "more experience[]" than Dr. Pyskir to perform the Leopold.   *See* PPFOF at ¶ 4. Instead, the Court concludes that Dr. Pyskir was sufficiently experienced in light of his training both prior to and at Tripler in managing patients like Sara, including in obtaining EFWs by Leopold.   Contending that Dr. Pyskir was merely a one- or two-week intern as of August 31, 2019 is highly misleading.

25

154. While the failure to establish a breach of the duty of care is alone sufficient to find in favor of Defendant on this claim, the Court also addresses the issue of causation.[6]

155. The Court concludes that Plaintiffs have failed to show, by a preponderance of the evidence, that the failure to perform an ultrasound or have a more experienced doctor perform the Leopold examination of estimated fetal weight was a "substantial factor" in bringing about the complained-of harm to Plaintiffs.

156. First, the Court concludes that Plaintiffs have failed to show, by a preponderance of the evidence, that a more experienced doctor or an ultrasound would have resulted in an EFW triggering the duty to discuss a non-vaginal delivery with Sara, *i.e.*, an EFW of 5,000 grams or more.

157. Instead, in this regard, the Court finds most persuasive the testimony of Dr. Daneshmand that, regardless of experience, *neither* examinations by Leopold *nor* ultrasound are precise in estimating fetal weight. Because the methods are not meaningfully different in their precision, the Court concludes that it is only speculation—not a reasonable medical probability—that an EFW of 5,000 grams or more would have been obtained.

---

[6]In doing so, the Court assumes that a doctor more experienced than Dr. Pyskir should have performed the EFW in this case and/or that the EFW should have been obtained by ultrasound.

158. The Court also finds persuasive and consistent ACOG's determination that neither ultrasound nor physical/Leopold examination have been proven superior in estimating fetal weight.[7]

159. Second, the Court concludes that Plaintiffs have failed to show, by a preponderance of the evidence, that the maneuvers to relieve K.K.'s shoulder dystocia were a substantial factor in any complained-of harm.

160. In this regard, the Court finds most persuasive and credible the relevant testimony of various witnesses, beginning with Drs. Ligon and Phillips.

161. Specifically, the Court finds strongly persuasive Drs. Ligon and Phillips' testimony, in part, consistent with their contemporaneous medical notes, that they did not apply pressure to K.K.'s head or neck during the dystocia-relieving maneuvers and that the final maneuver did not involve the use of rotational traction.

162. The Court also finds persuasive and credible the testimony of Dr. Dyes that, for a tear in an artery to occur, there would need to be significant, abrupt rotational force—something which no evidence, and certainly no evidence found persuasive

---

[7]The Court further rejects Plaintiffs' suggestion—in examining numerous trial witnesses—that ACOG's determination in this respect is unworthy of persuasion because it purportedly does not encompass morbidly obese patients like Sara. *See, e.g.*, 1/29/26 Tr. at 22:9-14. Among other things, the relevant Bulletin has no such limitation or even an inkling of the same.

by this Court, supports having happened here, including any potential bruising to K.K. that may have been observed.

163. The Court also finds persuasive and credible the testimony of Dr. Rhine that compression of the carotid artery for ninety seconds, even had it occurred, would not cause a stroke, and the testimony of Dr. Dyes that, for compression of the carotid artery to cause a stroke, there would need to be pronounced, significant force of at least five minutes' duration.   Nothing in this case remotely suggests the latter ever took place.

164. Although anecdotal, the Court also cannot ignore that numerous experts testified on behalf of both Plaintiffs and Defendant in this case, with at least 190 combined years' experience in the fields of pediatrics, neonatology, and/or obstetrics.   *Not one* of these experts has *ever* seen an arterial ischemic stroke—the harm complained-of here—caused by shoulder dystocia or the maneuvers to relieve the same—the conduct complained-of here.

165. Therefore, on this record *in toto*, the Court concludes that Plaintiffs have failed to show, by a preponderance of the evidence, that the maneuvers to relieve the shoulder dystocia were more likely than not a substantial factor in bringing about the result complained of.

166. Accordingly, Defendant, United States of America, is entitled to judgment with respect to Plaintiffs' first claim of medical negligence.

167. The conclusions above also lead to a comparatively quick conclusion with respect to Plaintiffs' second claim of negligent failure to provide informed consent.

168. Specifically, the Court concludes that Plaintiffs have failed to show, by a preponderance of the evidence, that Sara's doctors owed a duty to offer her a caesarian delivery.[8]

169. In particular, as set forth above, the Court concludes that, because ultrasound and Leopold examination are not meaningfully different in their precision, it is only speculation that an EFW of 5,000 grams or more would have been obtained by a different method or practitioner, triggering the duty to offer a caesarian delivery to Sara on which Plaintiffs rely.

170. Accordingly, because the EFW here was 3,600 grams, which no witness or party contends triggers the relevant duty, Plaintiffs have failed to establish the breach of a duty owed with respect to their second claim, and Defendant, United States of America, is entitled to judgment with respect to the same.

---

[8]The Court assumes that this is the basis of Plaintiffs' informed-consent claim. *See* PPFOF at ¶ 4. The Court notes that it is not straightforward to ascertain the same, given that Plaintiffs do not appear to dedicate any part of their proposed conclusions of law to this claim.

## CONCLUSION

For the reasons set forth herein, the Clerk is instructed to enter Judgment in favor of Defendant, United States of America, pursuant to Federal Rule of Civil Procedure 58.

Defendant's motion to strike the errata sheet of Dr. Betty Jo Freeman, Dkt. No. 112, is DENIED AS MOOT.

IT IS SO ORDERED.

Dated: May 11, 2026 at Honolulu, Hawai'i.

Derrick K. Watson
Chief United States District Judge

---

Sara Kahler, individually and as next friend for KK, a minor, and Tylor Kahler v. United States of America, et al; Civil No. 23-00300 DKW-WRP; **FINDINGS OF FACT AND CONCLUSIONS OF LAW**